Robert J. PFEIFFER and Mary W. Pfeiffer, Plaintiffs,

v.

GENERAL INSURANCE CORPORA-
TION, a Texas corporation,
Defendant.

No. 38142.

United States District Court
N. D. California, S. D.

Aug. 16, 1960.

Lillick, Geary, Wheat, Adams & Charles, Gilbert C. Wheat, Peter M. Kardel, San Francisco, Cal., for plaintiffs.

Sedgwick, Detert, Moran & Arnold, Scott Conley, San Francisco, Cal., for defendant.

HARRIS, District Judge.

Plaintiffs, husband and wife, are owners of a home in Orinda, California, identified as 1 Easton Court. They purchased this home toward the end of 1957 and obtained a fire insurance policy from defendant, General Insurance Corporation. The policy included an all-physical loss and other endorsements among its extensions. Encompassed within the general damage coverage was landslide.

In the present action plaintiffs seek to recover the maximum amount set forth in the policy for landslide damage to their "dwelling," namely, $26,000, which is the limit in the policy on landslide coverage, and $5,000 which is the limit for additional living expense coverage.

During the trial of this case plaintiffs produced evidence which establishes the fact that restoration of the premises, including stabilization of the land both under the house and above it, would exceed the $26,000 limit. The testimony shows that the minimum cost to stabilize the land underneath plaintiff's house is approximately $23,000; the cost of repairs to the house itself, approximately $8,000. Thus, for $31,000 plaintiffs may restore their dwelling. Other alternative solutions to the problem, such as movement of the home to another lot and reconstruction of it or sale of the home "as is" and acquisition of comparable premises elsewhere, also would give rise to an expenditure or loss in excess of the policy limitations.

With respect to the additional living expense coverage, plaintiffs have shown that their rental of another home during the period following the landslide and up to the present time will be in excess of the $5,000 limitation. Thus, plaintiffs have maintained the burden of proof with respect to establishing damages under the terms of the policy.

The sole issue as refined at the trial is: Does an insurance policy which insures a dwelling against the perils of landslide cover the land underlying the house, as well as the house itself?

If "dwelling" encompasses such land then plaintiffs are entitled to recover in full. But if "dwelling" includes only

the residence structure itself and not the land upon which it is situated, then plaintiffs are entitled only to have their home restored to its condition prior to the damage incurred because of the landslide. In such latter event plaintiffs regard the residence as dangerous and uninhabitable.

Defendants contend that under the "replacement cost" coverage provisions of the policy that the limit of the company's liability is for the repair of the existing building structure which can be undertaken for a sum not to exceed $5,000. Defendants concede liability in this latter amount.

The insurance policy itself, in its description of the property insured and coverages afforded, has the following language:

"1. Description of Property Insured and Coverages Afforded.

"A. Dwelling. Coverage A applies to the dwelling described in the declarations, including architect's fees, lawns, building equipment and fixtures and outdoor equipment pertaining to the service of the premises (of the property of the owner of the dwelling), while located on the described premises, and all lumber and materials on the premises or adjacent thereto incident to the construction of such dwelling, But Not Trees, Shrubs Or Plants."

The term "dwelling" is used in different context. Thus, with respect to theft, it is used to cover "private structures" (2B). In connection with the construction of the dwelling the policy refers to "shake roof, frame" which is descriptive of the building itself and does not shed light on the present problem of interpretation of the term "dwelling."

In connection with the All Physical Loss Building Endorsement, the policy refers to certain maximum sums for which the company will be liable in re-

placing the damaged parts of the building structure or in repairing any damages which may have occurred to the building. Thus, this clause obviously is limited to losses incurred to the building alone. However, it does not enable the court to construe the meaning of "dwelling" except to establish the fact that it obviously includes the building.

Vol. 13 Words and Phrases, and Pocket Part, discloses that "dwelling" has been interpreted in both a narrow and a broad sense depending upon the particular case and the context in which the term is used. Thus, in Rowson v. Rowson, Tex.Civ.App., 268 S.W.2d 708, 715, it is held that "a description in a contract of sale or lease of a 'dwelling' or 'house' carries with it by necessary implication the real estate upon which the building is situated and so much of the surrounding real estate as is necessarily incident to the use of the premises as a dwelling." This construction is consistent with the interpretation of "dwelling" in numerous other cases which hold that it includes the curtilage or surrounding land. For example, Dennis v. State, Ala.App., 111 So.2d 21, 24; Massachusetts Audubon Society v. Ormond Village Improvement Ass'n, 152 Fla. 1, 10 So.2d 494, 495. These cases follow the common law doctrine that a dwelling includes the curtilage.

In Hamilton v. North American Accident Ins. Co., 99 Neb. 579, 157 N.W. 111, 112, the policy insured against loss of life caused by "burning of a dwelling." The insured died as the result of burns sustained while trying to put out a brush fire in the backyard. The fire did not reach any building or dwelling. Judgment was entered against the insurance company and the court pointed out that the word "dwelling" is entitled to a much broader meaning than the phrase "dwelling house" or "dwelling building." Thus, "dwelling" has been held susceptible of more than one meaning. There are well-considered authorities construing the term in a sense which permits cov-

erage of the surrounding land, as well as specific buildings.[1]

In the case at bar it is manifest that the land underlying the house must be encompassed within the word "dwelling" unless the policy is to be interpreted as illusory. It appears to this court, and the court finds, that no amount of repairs to the present structure *alone* will cure the damage or replace the dwelling until the earth movement under the structure is stabilized.

The proof is clear that the land beneath the house is unstable and is part of a slide which is presently active. To rebuild the house or repair the garage until the underlying land is stabilized would be contrary to the weight of expert testimony elicited during the trial. It is manifest from the testimony that although the slide may be momentarily halted it will continue on in lesser or greater degree until eventually it will culminate in a dramatic sequence to the initial slide. Must the plaintiff await the result of fire from disturbed gas lines and other myriad difficulties and hazards in rebuilding or repairing the house on a constantly shifting and sliding mass?

A contract of insurance is an agreement to indemnify the insured against loss from contingencies which may or may not occur. When the contingency arises, then the liability of the insurer becomes a contractual obligation.

The contingency having arisen, the contractual obligation of the insurer becomes operative immediately when, as it appears herein, the burden of proof has been discharged by plaintiff in demonstrating that it would be improvident,

unsafe and inconsistent with standard engineering practice to repair the house, without at the same time stabilizing the shifting and unstable land under, above and supporting the dwelling, as an integrated part thereof.

Defendant would have the plaintiffs await some indefinite future date in measuring their rights under the policy, although conceding that further landslide damage to the buildings is possible. The only problem which appears to be posed by the defendant is the precise time when further slides will inevitably occur, with consequent damage to the buildings.

It seems within the fair intendment of the defendant's contractual obligations that, when it appears proximate and certain that additional slides will occur, to require plaintiffs to repair the house and garage on a mass of shifting earth is to render abortive their rights and to place a construction thereon that results in an absurdity. Until the earth movement, i. e., the landslide, is stabilized, the dwelling will continue to suffer damage and the occupants imperiled.

In Harman v. American Casualty Co., D.C., 155 F.Supp. 612, 613, the plaintiffs in a declaratory relief action sought to forestall cancellation of insurance policies covering family structures. The defendant issued fire insurance policies on the structures and included therein the "all physical loss" provision. Both policies were in effect when a massive and continuing land movement commenced in the area. Damage was substantial and continuous. With full knowledge of the existing land movement the company sought to cancel the policy. The court ruled that the *contingency* having arisen

1. Marston v. Stickney, 58 N.H. 609, 610 (A grant of a dwelling house conveyed a garden and orchard); Jackson v. White, 8 Johns., N.Y., 59, 63 (A devise of a dwelling house included a stable, yards, gardens, etc., as well as 18 acres of land adjoining the house); Damon v. Baltimore & Pacific R. Co., 119 Pa. 287, 13 A. 217, 221 (Dwelling house included as much of the curtilage as was necessary for reasonable and proper enjoy-

ment of the house as a residence, thus protecting surrounding land from passage of railroad); Appeal of Swift, 111 Pa. 516, 2 A. 539, 541 (Dwelling house necessarily included curtilage so as to forestall railroad from interfering with enjoyment of house); State v. Lee, 120 Or. 643, 253 P. 533, 534 (Dwelling interpreted to include cluster of buildings within curtilage).

the liability of the insurer became a contractual obligation and that cancellation of the policy could not affect rights which had already accrued. The court said, in part (at page 614):

"The defendant in argument and in its brief recognizes its liability for slippage until the total destruction of the property, or until the present movement ceases and the land again becomes stable, but contends that other risks assumed by the defendant ended upon the notice of cancellation.

"With this we cannot agree. It is easily understood why the defendant desires to escape the risk of fire. The hazards of fire are greatly increased by the earth movement and fire protection under the present conditions is at a minimum in the area affected."

Plaintiffs have established, through competent engineering testimony, that the land under and about the house is not stable, nor will it stabilize itself. It will require shoring up and other stabilizing and engineering features and requirements. Although the testimony discloses that further slippage is imminent no one ventured to predict the precise moment when the event would take place. The hazards incident to maintaining a domicile for a family under such circumstances are apparent. It will mean the severance of gas pipe and water connections and other incident damages to the premises which will render them unlivable. Unless steps are taken by the defendant insurance company to stabilize the land, as well as to repair the premises, the policy in question will be of no avail to the insured.

The court has endeavored to resolve doubts and ambiguities in the interpretation and construction of the policy in favor of the insured (Calif.Civ.Code, Sec. 1654; Raulet v. Northwestern Nat. Ins. Co., 157 Cal. 213, 107 P. 292) and thus prevent the insurer from taking an unjust and unfair advantage of the in-

sured and weaken the purpose for which the policy was issued.

Judgment may be entered in favor of plaintiffs for the amount prayed. Proposed findings of fact and conclusions of law and decree to be submitted.