[No. D013384. Fourth Dist., Div. One. Apr. 16, 1992.]

PINES OF LA JOLLA HOMEOWNERS ASSOCIATION,
Cross-complainant and Appellant, v.
INDUSTRIAL INDEMNITY, Cross-defendant and Respondent.

COUNSEL

Aguirre & Eckmann, James K. Eckmann and Duane Shinnick for Cross-complainant and Appellant.

Hughes & Nunn and Randall M. Nunn for Cross-defendant and Respondent.

OPINION

**FROEHLICH, J.**—This case presents the narrow issue of whether an insurer may rely on a clause in its insurance policy (the so-called "other insurance" clause) to escape liability for damages which may have occurred during its policy period, merely because a second insurer in fact paid such damages as part of a settlement on behalf of the insured. We conclude, on the facts presented here, that mere payment of settlement proceeds by the second insurer did not constitute that insurer's binding admission of its liability for all claims presented in the lawsuit, and hence summary judgment based on the "other insurance" clause was inappropriate. We therefore reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

### I. *The Project*

The facts, construed most strongly in favor of appellant, reflect that between 1979 and 1984, a 247-unit condominium project known as "Pines of La Jolla" was developed. A&A Construction Company, Inc., and Augusto Angelucci (hereinafter insureds) were involved in developing the project.

### II. *The Insurance Policies*

The insureds had five different insurers during the relevant time period, only two of which are germane to our analysis. For the period of April 26, 1981, through April 26, 1982, the insureds were covered under a comprehensive general liability policy issued by respondent Industrial Indemnity (I.I.). After a one-year period of coverage by another insurer, Fireman's Fund Insurance Company (Fireman's Fund) issued similar liability coverage to the insureds for the period 1983 through 1986.

The policies issued by both I.I. and Fireman's Fund were occurrence-based policies which, in relevant part, contained identical language insuring against identical risks. Both policies (1) insured against liabilities of the insureds for "property damage . . . caused by an occurrence"; (2) defined "occurrence" as an "accident . . . which results in . . . property damage neither expected nor intended from the standpoint of the insured"; and (3) defined "property damage" as "physical injury to . . . tangible property which occurs during the policy period."

### III. *The Lawsuits*

#### A. *The Construction Defect Litigation*

The evidence submitted in opposition to I.I.'s summary judgment motion indicated the project may have begun suffering damages from defective

construction beginning in 1981 or early 1982, during I.I.'s tenure as insurer. For example, demand letters from attorneys representing the project's home-owners association, Pines of La Jolla Homeowners Association (Pines), stated the project suffered from problems created by improperly installed light fixtures and lack of water. Repair records also showed that during I.I.'s tenure the project suffered from problems created by water intrusion, defective plumbing, improperly sealed windows, and defective electric gates. Furthermore, depositions of three homeowners suggested that during I.I.'s tenure they had discovered defects, such as crumbling concrete, cracked balconies, leaky walls, etc.

In 1984 the homeowners association for the project, Pines, sued the insureds for a host of distinct construction defects in the project. None of the insurers conceded either coverage or a duty to defend the insureds for the claims asserted in the construction defect lawsuit. However, Fireman's Fund provided a defense to the insureds, eventually funding a settlement which extricated the insureds from the lawsuit. Although Fireman's Fund paid the costs of defense and settlement proceeds, it settled in order to "stop the bleeding" of the mounting defense costs spawned by this extremely complex litigation, not because it conceded the other insurers had no liability for the claims asserted in the construction defect lawsuit.

Under the settlement agreement, Fireman's Fund paid $2.9 million to Pines. As additional consideration for Pines' agreement to release the in-sureds from the construction defect lawsuit, Fireman's Fund assigned to Pines any rights held by Fireman's Fund to seek contribution or indemnity from three of the other insurers,[1] including I.I. Thus, the settlement contemplated that any additional recoupment by Pines for damages would have to be pursued through the "coverage litigation," i.e., Pines would have to seek recovery from the three other insurers (including I.I.) on Fireman's Fund's claims for contribution, indemnity or subrogation.

## B. *The Coverage Litigation*

In 1989, Fireman's Fund filed its lawsuit (the coverage lawsuit) for declaratory relief, equitable subrogation and contribution against West American Insurance Company, seeking reimbursement for a share of the amounts expended by Fireman's Fund to defend and settle the construction litigation. Pines later became involved in this coverage lawsuit by its cross-complaint, which alleged Pines' status as assignee of Fireman's Fund's

---

[1]Pines was assigned Fireman's Fund's right to contribution as against I.I., State Farm Fire & Casualty Company, and Allianz Insurance Company. However, Fireman's Fund retained its right to seek indemnity as against West American Insurance Company.

rights, and which pleaded claims for declaratory relief, equitable subrogation and contribution as against I.I., seeking reimbursement of a share of the amounts Fireman's Fund paid to defend and settle the construction lawsuit.

### C. The Summary Judgment

The current appeal tests the validity of the trial court's order granting I.I.'s motion for summary judgment against Pines in the coverage lawsuit. I.I.'s motion depended entirely on the efficacy of the "other insurance" clause of I.I.'s policy to insulate it from liability. I.I. argued that under the terms of the "other insurance" clause in the I.I. policy,[2] I.I. was solely an "excess carrier" for any liability of its insureds because there was other "available" insurance—the Fireman's Fund policy. I.I. therefore argued that, as an excess carrier, it was not required to defend or indemnify its insured unless and until all other "available" insurance had been exhausted, pointing out that, here, the policy limits of the other available insurance (Fireman's Fund) had not been exhausted by the settlement.

 Pines opposed the summary judgment motion, arguing there were triable issues of fact as to whether some of the defects first became manifest during I.I.'s policy period, and that the "other insurance" clause does not become operative unless two policies apply to the same loss.[3] Pines pointed out that because the I.I. policy covered a time frame different from that covered by the Fireman's Fund policy, and there were manifestations of losses during I.I.'s policy period, the "other insurance" clause did not permit I.I. to avoid liability as an "excess carrier."

[2]The "other insurance" clause, contained in an endorsement to I.I.'s policy, provides:

"The insurance afforded by this policy is excess insurance over any other insurance available to the Insured . . . and the insurance afforded by this policy shall not be collectible by the Insured or any other person until the policy limits of all other insurance . . . shall be paid and exhausted."

[3]Pines also asserted below, and argues on appeal, that evidentiary problems also prohibit summary judgment. First, Pines objected to I.I.'s failure to produce the *original* of the insurance policy in support of its summary judgment motion. Pines claimed that the "best evidence" rule required use of the original insurance policy and precluded the rendition of a summary judgment based upon only a copy. While this holding was enunciated by *Central Mutual Ins. Co.* v. *Del Mar Beach Club Owners Assn.* (1981) 123 Cal.App.3d 916 [176 Cal.Rptr. 895] [copy of insurance policy violates best evidence rule and precludes summary judgment], that decision was rendered before the addition in 1985 of Evidence Code section 1511 (see Stats. 1985, ch. 100, § 2, p. 237), which carved a specific exception to the best evidence rule for copies. Since neither caveat to section 1511's exception appears even arguably applicable, the copy of the policy here does not violate the best evidence rule. Pines also complains that the copy of the endorsement, although providing a space for the insurer's signature, was not signed. However, the document itself explains such signature is *unnecessary* when the endorsement is issued as part of the original policy, and the declarations page of I.I.'s policy reflects the endorsement *was* part of the original policy.

The trial court accepted I.I.'s argument, rejected Pines' argument, and granted I.I.'s motion. Following entry of judgment, Pines appealed.

■ We conclude the trial court erred in entering summary judgment based on the "other insurance" clause. The evidence created triable issues of fact as to when damages caused by different defects at the project first became manifest. The relevant policy language provided the insureds protection against liability for damages suffered during each policy period. Each insurer therefore was liable for all of the damages attributable to a defect first manifested during the period that insurer was "on risk." Hence, the existence of insurers in subsequent years does not render those later policies "available" to cover the previously manifested loss. Because the multiple policies here do not cover the same loss, the "other insurance" clause is irrelevant to assessing priorities among the competing insurers, and the fact of settlement (in the absence of a determination of coverage) does not make the settling insurer liable for losses which occurred on another insurer's watch.

ANALYSIS

I. *The Insuring Language Contained in These Policies Provides That the Insurer on Risk at the Time the Particular Defect Was First Manifested Is Liable for All Damages Caused by the Defect, Even Though the Damages Grew During a Later Insurer's Policy Period*

With the entry of summary judgment solely on the basis of I.I.'s "other insurance" clause, we must initially decide which policy or policies undertook the risk of insuring against liability for losses which first surfaced during I.I.'s tenure. We begin by noting that Pines produced evidence showing that some of the claimed damages may have first "occurred" during I.I.'s policy period. Both the policies of I.I. and Fireman's Fund appear to be standard liability policies indemnifying their insureds for liability based on "occurrences" during the policy period (*Chu* v. *Canadian Indemnity Co.* (1990) 224 Cal.App.3d 86, 94-95 [274 Cal.Rptr. 20]); therefore at issue are the relative responsibilities of successive insurers for a loss which begins in one insurer's term and continues during a subsequent insurer's term.

The language of the liability policies here makes clear that the insurers only undertook the risk of injuries occurring *during* their respective policy period. ■ An injury does not necessarily occur when the wrongful act is committed, either for the purpose of accrual of the injured parties' cause of action (*Allen* v. *Sundean* (1982) 137 Cal.App.3d 216, 222 [186 Cal.Rptr. 863]) or for the purpose of determining whether the tortfeasor's liability

insurer must provide coverage for the injury. (*Remmer* v. *Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84, 88 [295 P.2d 19, 57 A.L.R.2d 1379].) Instead, an injury occurs when appreciable damage is suffered by the injured party. In *Remmer*, the court examined a third party liability policy containing language substantively indistinguishable from the insuring language of the instant policies. The *Remmer* court held that the "time of the occurrence of an accident within the meaning of an indemnity policy is . . . the time when the [third] party was actually damaged." (*Ibid.*; accord, *Prudential-LMI Com. Insurance* v. *Superior Court* (1990) 51 Cal.3d 674 [274 Cal.Rptr. 387, 798 P.2d 1230].)

Moreover, once the contingency insured against (i.e., the damage occurring during the policy period) has materialized, the courts have held that the insurer is liable for all losses connected therewith, even though the damage may continue to grow after the policy has lapsed. (*Snapp* v. *State Farm Fire & Cas. Co.* (1962) 206 Cal.App.2d 827, 830-832 [24 Cal.Rptr. 44].) The courts have reasoned that once the loss has "occurred," the insurer's contractual liability arises, the only issue then being the *extent* of its liability. It is immaterial that such liability is not fully ascertained until after the policy period. (*Ibid.*) Furthermore, since an insurer may only insure against contingent or unknown risks of loss, a policy issued after the "loss in progress" has begun does not cover such loss. (See *Fireman's Fund Ins. Co.* v. *Aetna Casualty & Surety Co.* (1990) 223 Cal.App.3d 1621 [273 Cal.Rptr. 431]; accord, *Home Ins. Co.* v. *Landmark Ins. Co.* (1988) 205 Cal.App.3d 1388, 1395-1396 [253 Cal.Rptr. 277].)

In *Fireman's Fund Ins. Co.* v. *Aetna Casualty & Surety Co.*, *supra*, 223 Cal.App.3d 1621, this court was required to decide whether the "loss in progress" rules of *Home Insurance* should be applied to third party liability insurance policies. The *Fireman's Fund* court concluded the "occurrence" policies of the respective insurers (which contained insuring language similar to the instant policies) should be construed as placing the entire loss attributable to the "loss in progress" on the insurer whose policy was in effect at the time the damage first became manifest. The *Fireman's Fund* court reasoned, in part, that Insurance Code section 22, coupled with Insurance Code section 250, provides that an insurer can only insure against the risk of a contingent or unknown event materializing during the policy term, and hence a policy issued after the inception of a "loss in progress" would not cover that loss because the fact of damage would not have been contingent or unknown when the policy was issued. (*Fireman's Fund, supra,*

at p. 1627 and fn. 5.) *Fireman's Fund* also noted the dispute in that case was over the relative apportionment of a loss between two insurers based on the language of their policies, and therefore the industry understanding of the intent of the language of an "occurrence" policy—to anchor all losses in the one policy in effect at "the onset of the condition" rather than to apportion them over several policies—provided an additional basis to adopt the "loss in progress" rule as to those policies.

The same considerations apply here. The insuring language is similar; the governing provisions of the Insurance Code apply; and this dispute involves interpreting and applying policy language to assign each of the two competing insurance policies its share of responsibility for a loss. We conclude, therefore, that the "loss in progress" rules should be applied here, and hence any loss first manifested during I.I.'s policy period would be I.I.'s, and not Fireman's Fund's, responsibility.[4]

We conclude that to the extent damages were first manifested during I.I.'s policy period, I.I.'s policy language renders it liable for all damages attributable to the underlying defect manifested during such policy period. Even though the damage may have become progressively worse during Fireman's Fund's tenure, Fireman's Fund was not liable for the incremental damages from the loss in progress. Since there is evidence from which a trier of fact could conclude some part of the damages to the project was initially manifested during I.I.'s policy,[5] there are triable issues of fact as to what part of Pines' damages was the responsibility of I.I. rather than Fireman's Fund.

---

[4]Cases addressing first party insurance policies have grappled with the problems presented when an ongoing, progressive condition causes damages which span the tenures of various insurance policies. These cases have arrived at the same conclusion reached here: the insurer "on risk" at the time the damage first becomes manifest is liable for the *entire* injury, even though the *extent* of that injury may be unknown until long after the policy of the first insurer has lapsed. (*Home Ins. Co.* v. *Landmark Ins. Co.*, *supra*, 205 Cal.App.3d at p. 1396 [insurer on risk when damages first became apparent is liable to cover the entire loss]; *Prudential-LMI Com. Insurance* v. *Superior Court*, *supra*, 51 Cal.3d 674, 693-699 ["loss in progress" rules place the entire loss on the insurer on risk at the time of manifestation, and manifestation is a question of fact, dependent on when appreciable damage occurs and is or should be known to the injured party].)

[5]In the construction defect litigation, Pines' complaint claimed the existence of multiple defects, and alleged such defects began manifesting in 1983—during Fireman's Fund's tenure. However, because a project suffering from multiple defects requires that each defect be analyzed separately to determine when it was first manifested, and there was evidence suggesting at least some of the defects may have been manifested earlier than 1983, it remains a factual question as to when each injury was first manifested. (*Chu* v. *Canadian Indemnity Co.*, *supra*, 224 Cal.App.3d at pp. 97-102.)

II. *Because I.I. Is, and Fireman's Fund Is Not, Responsible for Losses Which First Manifested During I.I.'s Policy Tenure, There Are Not Multiple Policies Applicable to the Same Loss*

Once it is recognized that each category of damage remains the responsibility of the insurer on risk at the time such damage was first manifested, it becomes apparent that the basis of the instant summary judgment—the "other insurance" clause—has no application in this case. This is because the policies issued by I.I. and Fireman's Fund were applicable to, and provided coverage for, occurrences during different time frames.

The determination of the effect competing "other insurance" clauses can have on each other's liability can present difficult and complex questions. (See, e.g., *Employers Reinsurance Corp.* v. *Phoenix Ins. Co.* (1986) 186 Cal.App.3d 545, 556-557 [230 Cal.Rptr. 792].) ██ We need not address such questions here, because the application of "other insurance" clauses requires, as a foundational element, that there exist multiple policies applicable to the *same loss*. A leading treatise, in the chapter which specifically addresses the right to contribution and indemnification among multiple insurers, explains:

"An insured may be covered by more than one policy. Of course, the rights and liabilities of the different insurers involved depend, at least in part, upon the specific language of the policies.

"*Other insurance clauses do not, of course, create coverage where none exists.* The purpose, rather, of an "other insurance" clause is to limit a particular company's liability. Such a clause of an automobile policy does not provide for coverage but provides, instead, how multiple coverages should be prorated. . . .

"Where there are several policies which insure the same party, upon the same subject matter, and assume the same risk, this constitutes double, or overlapping, insurance. *This contemplates, of course, an identity of risk, so that if different risks are covered by the several policies, the question of allocation or contribution well might not arise.*" (8A Appleman, Insurance Law and Practice (1981) Other Insurance—Contribution and Indemnification, § 4907.65, pp. 364-368, fns. omitted, italics added.)

Our review of the California authorities,[6] as well as those of other jurisdictions,[7] confirms that "other insurance" clauses have been found effective only in situations where multiple policies all covered the same loss or risk. Although I.I. cites numerous cases which have upheld and enforced "other insurance" clauses in determining the rights among insurers inter se, those cases all involved factual patterns in which each of the competing policies covered the same risk.[8]

I.I. argues that other courts have used "other insurance" clauses to apportion primary versus excess responsibility even though the competing policies covered different time frames.[9] However, the only case involving a dispute between insurers whose policies covered successive years is *Employers Reinsurance Corp.* v. *Phoenix Ins. Co., supra,* 186 Cal.App.3d 545. That case provides no support for I.I. because each of the policies there, although issued in successive years, covered the same loss.[10] (*Id.* at p. 556.) Thus,

---

[6]See, e.g., *Employers Reinsurance Corp.* v. *Phoenix Ins. Co., supra,* 186 Cal.App.3d at page 545 (in analyzing "other insurance" clauses, preliminary step is to determine whether all policies were at risk); *Continental Casualty Co.* v. *Pacific Indemnity Co.* (1982) 134 Cal.App.3d 389, 394 [184 Cal.Rptr. 583].

[7]See, e.g., *Seaboard Shipping Corp.* v. *Jocharanne Tugboat Corp.* (2d Cir. 1972) 461 F.2d 500, 503, footnote 3 (refused to order contribution, stating: "In this case, different risks were insured against by the three policies and the equitable doctrine of contribution between co-insurers of the same risk does not apply."); *Oakley* v. *Firemen's Ins. Co. of Newark, N.J.* (1947) 70 N.Y.S.2d 458 (refused to order contribution because policies covered different risks); *Continental Cas. Co.* v. *Signal Ins. Co.* (1978) 119 Ariz. 234 [580 P.2d 372, 376] ("Because the risks insured by the policies . . . are not identical, . . . contribution, as a matter of law, will not be granted. The interest[s], risks, and subject matters must be identical before contribution will be granted.")

[8]See, e.g., *Nabisco, Inc.* v. *Transport Indemnity Co.* (1983) 143 Cal.App.3d 831 [192 Cal.Rptr. 207] (enforced "other insurance" clause where insured had own policy, and was additional insured under competing policy containing "other insurance" clause); *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593 [178 Cal.Rptr. 908] (all involved policies applied to the risk).

[9]Although I.I. cited two cases for this proposition, one of its cases (*Chubb/Pacific Indemnity Group* v. *Insurance Co. of North America* (1987) 188 Cal.App.3d 691 [233 Cal.Rptr. 539]) simply does not contain the holding urged by I.I. Careful review finds no hint that the competing insurers there covered the insured for different time frames. To the contrary, the dispute was between a primary insurer and an excess insurer ". . . *for the same policy period.* . . ." (*Id.* at p. 693, italics added.)

[10]Employers' policy covered acts or omissions which occurred during its tenure between 1970 and 1975; the Phoenix policy covered acts or omissions which occurred during its tenure between 1975 and 1979 *and any claims made or suits brought* during its tenure for acts prior to its policy period; and the National policy covered liabilities for acts *prior* to its policy period as long as the claim was made or suit was brought during its policy period. (186 Cal.App.3d at pp. 550-551.) The *Employers Reinsurance* court, before addressing the interplay of the "other insurance" clauses, made the initial determination that the basis of the malpractice lawsuit was an act or omission which "occurred" in 1974, implicating Employers' policy;

even though the policies were *issued* in different years, they all *covered* the same risk.

Unlike *Employers Reinsurance*, there is no contention here that the Fireman's Fund policy covers, on a "claims made" or "suit brought" basis, liabilities for occurrences during I.I.'s tenure. Instead, the policies appear to be standard "occurrence" policies, limited in application to risks during their tenures. Under these circumstances, we are compelled to conclude the policies of I.I. and Fireman's Fund do not apply to the same risks, and hence there is no occasion for allocating losses based on application of the "other insurance" clauses.

III. *Fireman's Fund's Payment of the Settlement on Behalf of the Insured Does Not Preclude Fireman's Fund From Seeking Contribution From I.I.*

I.I. argues that an excess insurer, which status I.I. claims by virtue of its "other insurance" clause, has no obligation to contribute to either the defense or the indemnification of its insured because the policy limits of the primary carrier (Fireman's Fund) were never exhausted. While this is a correct statement of abstract principles (see, e.g., *National American Ins. Co. v. Insurance Co. of North America* (1977) 74 Cal.App.3d 565, 576 [140 Cal.Rptr. 828]), it of course begs the question: Is I.I. a primary or an excess insurer for some portion of the claims satisfied by the settlement funded by Fireman's Fund?

I.I.'s principal argument supporting application of its "other insurance" clause is that the Fireman's Fund policy must be viewed as "other insurance available to the Insured" because Fireman's Fund (1) in fact provided a defense and funded the settlement and (2) never denied it was at least partly responsible for the claims raised in the construction defect litigation. Accordingly, I.I. concludes, the Fireman's Fund policy was "available" to the insured.

In essence, I.I. argues that Fireman's Fund's settlement is an admission that Fireman's Fund's policy covered all of the claims, even those which may have been first manifested during an earlier insurer's tenure. ■ We reject I.I.'s argument because an insurer who has *potential* liability in the underlying lawsuit is entitled to settle any claim alleged against it without prejudice to its right to seek equitable subrogation or indemnity from other

the lawsuit was filed in 1978, triggering the Phoenix coverage under the "suits brought" coverage; and the lawsuit was served during National's tenure, triggering National's coverage because the "claims made" coverage was deemed triggered when the insurer received first notice of the claim. (*Id.* at pp. 554-555.)

insurers alleged to have full or partial liability for the underlying claim. (*State Farm & Casualty Co.* v. *Cooperative of American Physicians, Inc.* (1984) 163 Cal.App.3d 199, 203-205 [209 Cal.Rptr. 251].) Where an insurer settles in good faith prior to a judicial determination of coverage, such insurer is not a mere volunteer and is entitled to pursue recovery (by way of claims for subrogation or indemnity) of amounts it paid which were in fact covered by the nonsettling insurer. (*United Pacific Ins. Co.* v. *Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 934-937 [266 Cal.Rptr. 231]; see also *Employers etc. Ins. Co.* v. *Pac. Indem. Co.* (1959) 167 Cal.App.2d 369, 376-378 [334 P.2d 658] [settling insurer entitled to recovery of payments on a claim for which it did not provide coverage, but for which the nonsettling insurer did.])

As previously discussed, the construction defect lawsuit alleged numerous distinct defects, each of which requires separate analysis as to when it first became manifest. (*Chu* v. *Canadian Indemnity Co.*, *supra*, 224 Cal.App.3d 86.) While many of the problems and associated damages allegedly were first manifested during Fireman's Fund's policy period (see fn. 5, *ante*), the evidence created factual questions as to whether other problems and damages may have been first manifested during I.I.'s policy period. Because Fireman's Fund paid a settlement encompassing *all* of these defects, a trier of fact could conclude it paid for damages which were at least in part the responsibility of I.I. Under such circumstances the paying insurer is entitled to seek subrogation or indemnity to the extent it paid an obligation owed by another insurer. (See, e.g., *Aetna Casualty & Surety Co.* v. *Safeco Ins. Co.* (1980) 103 Cal.App.3d 694 [163 Cal.Rptr. 219] [affirmed declaratory relief judgment entitling automobile insurers to recoup settlement payments made to an injured party from homeowners insurer which provided exclusive coverage for the loss].)

## IV. *Conclusion*

Fireman's Fund settled a lawsuit involving claims for which it was potentially liable. However, there was no judicial determination of coverage, and Fireman's Fund settled without conceding coverage for the entire gamut of losses alleged in the construction defect lawsuit. The settlement was not a binding concession by Fireman's Fund that *all* of the settlement proceeds were attributable to *all* damages covered under its policy, and did not preclude the settling insurer from contending the settlement proceeds encompassed elements of loss which I.I.'s policy covered. In that the "other insurance" clause is of no application in assigning priorities to the policies under the facts of this case, the settling insurer's right to subrogation or

indemnity remains disputable. Since complex factual questions remain, we deem summary judgment to have been improper and therefore must reverse. Appellant is entitled to costs on appeal.

Todd, Acting P. J., and Huffman, J., concurred.